# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DEBORAH A. HORNYAK,
     Plaintiff,

     v.

ANDREW SAUL, Commissioner of
Social Security,
     Defendant.

No. 3:18-cv-1950 (SRU)

## RULING ON CROSS-MOTIONS FOR JUDGMENT ON THE PLEADINGS

In this Social Security appeal, Deborah Hornyak ("Hornyak") moves to reverse the decision by the Social Security Administration ("SSA") denying her claim for disability insurance benefits or, in the alternative, to remand the case for additional proceedings. Mot. to Reverse, Doc. No. 14. The Commissioner of the Social Security Administration[1] ("Commissioner") moves to affirm the decision. Mot. to Affirm, Doc. No. 15. For the reasons set forth below, Hornyak's Motion to Reverse (doc. no. 14) is **granted** and the Commissioner's Motion to Affirm (doc. no. 15) is **denied**.

## I.     Standard of Review

The SSA follows a five-step process to evaluate disability claims. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). First, the Commissioner determines whether the claimant currently engages in "substantial gainful activity." *Greek v. Colvin*, 802 F.3d 370, 373 n.2 (2d Cir. 2015) (per curiam) (citing 20 C.F.R. § 404.1520(b)). Second, if the claimant is not working, the Commissioner determines whether the claimant has a "'severe' impairment," i.e.,

---

[1] The case was originally captioned "Deborah Hornyak v. Commissioner of Social Security." Since the filing of the case, Andrew Saul has been appointed the Commissioner of Social Security.

an impairment that limits his or her ability to do work-related activities (physical or mental).  *Id.* (citing 20 C.F.R. §§ 404.1520(c), 404.1521).  Third, if the claimant does have a severe impairment, the Commissioner determines whether the impairment is considered "per se disabling" under SSA regulations.  *Id.* (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).  If the impairment is not per se disabling, then, before proceeding to step four, the Commissioner determines the claimant's "residual functional capacity" based on "all the relevant medical and other evidence of record."  *Id.* (citing 20 C.F.R. §§ 404.1520(a)(4), (e), 404.1545(a)).  "Residual functional capacity" is defined as "what the claimant can still do despite the limitations imposed by his [or her] impairment."  *Id.*  Fourth, the Commissioner decides whether the claimant's residual functional capacity allows him or her to return to "past relevant work."  *Id.* (citing 20 C.F.R. §§ 404.1520(e), (f), 404.1560(b)).  Fifth, if the claimant cannot perform past relevant work, the Commissioner determines, "based on the claimant's residual functional capacity," whether the claimant can do "other work existing in significant numbers in the national economy."  *Id.* (20 C.F.R. §§ 404.1520(g), 404.1560(b)).  The process is "sequential," meaning that a petitioner will be judged disabled only if he or she satisfies all five criteria.  *See id.*

The claimant bears the ultimate burden to prove that he or she was disabled "throughout the period for which benefits are sought," as well as the burden of proof in the first four steps of the inquiry.  *Id.* at 374 (citing 20 C.F.R. § 404.1512(a)); *Selian*, 708 F.3d at 418.  If the claimant passes the first four steps, however, there is a "limited burden shift" to the Commissioner at step five.  *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).  At step five, the Commissioner need only show that "there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's residual functional capacity."  *Id.*

In reviewing a decision by the Commissioner, I conduct a "plenary review" of the administrative record but do not decide *de novo* whether a claimant is disabled. *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam); *see Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam) ("[T]he reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."). I may reverse the Commissioner's decision "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek*, 802 F.3d at 374–75. The "substantial evidence" standard is "very deferential," but it requires "more than a mere scintilla." *Brault*, 683 F.3d at 447–48. Rather, substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Greek*, 802 F.3d at 375. Unless the Commissioner relied on an incorrect interpretation of the law, "[i]f there is substantial evidence to support the determination, it must be upheld." *Selian*, 708 F.3d at 417.

## II.    Facts

Hornyak applied for Social Security Disability Insurance ("SSDI") benefits on December 9, 2015. Pl's Stmt. of Facts, Doc. No. 14-2, at 1. She alleges disability as of October 5, 2012 due to: sarcoidosis; erythromelalgia; peripheral neuropathy; sensory defect; inflammatory neuropathy; small fiber neuropathy; and fibromyalgia. R. at 92. As set forth more fully below, Hornyak's application was denied at each level of review. She now seeks an order reversing the decision or in the alternative, remanding for additional proceedings.

### A.  Medical History

In 2010, Hornyak was diagnosed with pulmonary sarcoidosis and Lofgren's syndrome. Pl's Stmt. of Facts at 1. She began treatment with Dr. Harjinder Chowdhary ("Dr. Chowdhary"),

a rheumatologist at Backus Hospital in Norwich, Connecticut.  R. at 344.  During his initial consultation with Hornyak on March 10, 2010, Dr. Chowdhary noted that she had "painful bumps on the left leg" and "swelling" on both ankles.  R. 358–59.  Dr. Chowdhary continued treating Hornyak's ankle and leg pain.  R. 350.  During a June 29, 2010 visit, Dr. Chowdhary noted that Hornyak was "doing better than before," but "still [had] swelling in her feet and ankles," which made her feel "very uncomfortable."  R. at 342.  Dr. Chowdhary also noted that Hornyak had "significant pitting edema" in both legs and ordered a CT scan of her chest and abdomen.  *Id.*

On February 26, 2012, a CT scan revealed that Hornyak had "[i]ncreasing nodularity of the lung parenchyma" and "mild pleural changes."  R. at 333.  She returned to Dr. Chowdhary on September 21, 2012, with symptoms of "pain all over her body," "sharp pain in the neck," and "occasional pain in the back, which goes to the left thigh."  R. at 535.  Dr. Chowdhary recommended x-rays of the back and neck and opined that "anxiety and stress" were "causing fibromyalgia-like symptoms."  *Id.*

That day, Hornyak was taken for x-rays.  R. at 329–30.  A cervical x-ray revealed "[m]inor degenerative disk changed at C5-C6."  R. at 329.  A lumbar x-ray revealed severe disc space narrowing at L5-S1, with vacuum phenomenon, mild endplate spurring, slight disc space narrowing at L3-L5 levels, and advanced degenerative disc disease at L5-S1.  R. at 330.  On June 14, 2013, Hornyak returned to Dr. Chowdhary for a follow-up.  R. at 456.  During that visit, he noted that Hornyak was "doing a little better than before," but complained of a "burning pain in the hands along with redness in the fingers."  *Id.*  Dr. Chowdhary commented that Hornyak's extremities were weak and that her hands were "red" and "painful."  *Id.* at 457.  During a physical exam on February 24, 2015, Hornyak showed soft tissue discomfort throughout her

4

body.  R. at 438.  Although Hornyak's sarcoidosis seemed to be in remission, Dr. Chowdhary noted that she had "18 out of 18 tender points."  *Id*.  At follow-up visits with Dr. Chowdhary on March 19, and April 13, 2015, Hornyak reported symptoms of whole-body pain accompanied by a burning sensation, and redness and pain in her hands and feet.  Pl's Stmt. of Facts at 2 (citing R. at 446, 452).  Dr. Chowdhary referred Hornyak to Dr. David Tinklepaugh ("Dr. Tinklepaugh"), a neurologist in Norwich, Connecticut.  R. at 413, 439.

Dr. Tinklepaugh evaluated Hornyak on April 27, 2015.  R. at 412.  During the visit, Hornyak reported worsening episodes of burning hand and foot pain, and numbness, pain and redness radiating from her forearms to her fingertips.  R. at 413.  Dr. Tinklepaugh noted that her hands were "brightly red but not swollen."  R. at 416.  Although her pain was "quite severe and [could] last for hours," Hornyak was "able to stand without difficulty."  R. at 413, 416.  Based on the assessment, Dr. Tinklepaugh concluded that Hornyak's presentation was consistent with erythromelalgia.  R. at 416.

On July 2, 2015, Hornyak returned to Dr. Chowdhary for a follow-up visit.  R. at 460.  Hornyak "still complain[ed] of pain all [over] the body from head to toe and she still [had] [a] burning sensation in the hands and feet."  R. at 460.  She had no limitation of motion on her hands but had swelling around her ankles and the loss of arch in the foot.  R. at 463.

Hornyak was referred to Dr. Kenneth Gorson ("Dr. Gorson"), a neurologist at St. Elizabeth Medical Center in Massachusetts, on September 4, 2015.  Pl's Stmt. of Facts at 3 (citing R. at 407).  Dr. Gorson noted that Hornyak's symptoms of sarcoidosis included a chronic hacking cough, extreme fatigue from insomnia, and delayed healing.  R. at 407.  Regarding Hornyak's neuropathic complaints, Dr. Gorson reported that Hornyak had "developed a chronic neuropathic pain characterized mostly as a burning sensation that at times is intolerable, and the

redness and swelling have now been more of a constant abnormality with fluctuation in intensity." *Id.* He also noted that Hornyak "had to leave work as an office manager for 20 years because she [could] no longer type, but interestingly [found] that she can tolerate crocheting." R. at 408. Dr. Gorson then examined Hornyak and reported that she had "red and swollen feet" and that "[h]er toes [were] swollen like sausages." *Id.* In addition, there was "slight swelling and erythema in [her] fingertips" in both of her hands. *Id.* Hornyak also "had trouble walking on her heels and toes due to pain." *Id.* Dr. Gorson confirmed that Hornyak had erythromelalgia, likely caused by her sarcoidosis. R. at 408–09. "She has the absolutely classic clinical pattern of episodic swelling, erythema and horrendous pain lasting minutes to hours to days." R. at 408.

Hornyak returned to Dr. Tinklepaugh on January 8, 2016.[2] His physical exam revealed distal sensation loss. R. at 636. "She [could not] feel cold temperature in either hand and it [was] diminished in the distal portions of her forearms . . . . Sensation [was] still present though diminished." R. at 639. Dr. Tinklepaugh opined that "[b]ecause of the severity of her symptoms and the severe loss of quality of life . . . the issue of treating for potential sarcoid should be revisited." *Id.*

Due to sudden "onset back pain," Hornyak underwent an MRI of the lumbar spine on January 14, 2016. R. at 557. The MRI showed disc desiccation at L5- S1, with near complete loss of disc height and the presence of a 1.8 centimeter epidural mass along the posterior and left aspect of the L5 vertebra extending to the lateral recess, which was a large extruded disc fragmentation of the L4-L5 disc. *Id.* In addition, the L5 nerve root was compressed. *Id.*

---

[2] The Commissioner notes that there is a discrepancy regarding whether Dr. Tinklepaugh examined Hornyak on January 8, 2016 or January 8, 2015. *See* Def's Stmt. of Facts, Doc. No. 16 at 5 n.4. Although Dr. Tinklepaugh's notes provide that the visit occurred January 8, 2015, his electronic signature is dated "January 8, 2016 12:13:45 PM." R. at 640. The heading in the Progress Notes also provides that the visit occurred on "January 8, 2016." R. at 636.

Hornyak was referred to Dr. Camille Salame ("Dr. Salame"), a neurosurgeon, for evaluation of symptoms of back pain and radiating leg pain.  Pl's Stmt. of Facts at 5 (citing R. at 541–57).  An x-ray revealed moderate degenerative disc disease at L5-S1 with no fracture or bone destruction.  R. at 549.  Hornyak reported using a cane due to her left leg pain.  R. at 580. During a January 18, 2016 consultation, Dr. Salame noted that Hornyak "felt significant numbness and tingling in the left foot and her worst symptoms now were localized to the left foot area."  *Id.*  Hornyak's "gait was extremely antalgic."  R. at 581.  She had difficulty with range of motion in her lower back and "difficulty standing on her left heel."  *Id.*  Dr. Salame diagnosed Hornyak with "significant left-sided sciatica" caused by a "ruptured herniated nucleus pulposus at L4-L5."  *Id*.  He recommended surgery.  *Id.*

Accordingly, on January 29, 2016 Hornyak underwent left L4-5 discectomy and L5 laminectomy.  R. at 577.  Two weeks later, Hornyak followed up with Dr. Salame who opined that Hornyak was "coming along very well."  R. at 565.  "She [had] noticed improvement with some residual numbness in [her] left foot."  *Id*.

On May 10, 2016, Dr. Michelle Holmes ("Dr. Holmes") with Disability Determination Services ("DDS") conduced a medical evaluation.  R. at 112.  She noted that Hornyak's sciatica improved after surgery and that Hornyak retained a residual functional capacity for a narrow range of light work.  R. at 26, 113.

On June 7, 2016, Hornyak had an acute five-day flare up of back symptoms, which resulted in an emergency room visit.  R. at 609.  The examining practitioner noted that Hornyak reported "lower back pain radiating across [her] lower back and hips" that began after she carried groceries into her house.  R. at 609.  During the visit, Hornyak "denie[d] any numbness tingling or weakness" and that her "pain had been controlled" prior to the flare up.  *Id.*  A week later,

Hornyak was diagnosed with anxiety by her primary care provider, Melanie Hopkins, a physician's assistant. Pl's Stmt. of Facts at 6 (citing R. at 590). Hornyak was prescribed Xanax. Def's Stmt. of Facts at 8.

Hornyak was seen by Dr. Tinklepaugh for another follow-up appointment on August 23, 2016. R. at 632. Although Hornyak "had done fairly well for a few months" she recently "developed paresthesias" in her left foot. *Id*. "Now in addition to the numbness and tingling in her hand . . . the entire distal portion of the left foot feels numb." *Id*. Dr. Tinklepaugh also examined Hornyak's neck and face. "Towards the end of our visit, she mentioned her face felt very hot and indeed she began to develop red discoloration of her entire face and upper part of her neck." R. at 634. Dr. Tinklepaugh also noted, however, that despite her symptoms Hornyak was "able to stand without difficulty." R. at 635. He referred Hornyak for another cervical MRI to address her symptoms. R. at 631.

The MRI conducted on August 25, 2016 revealed a left paracentral disc herniation at C-5-6, which mildly flattened the ventral aspect of Hornyak's cervical cord without significant myelopathic cord change. *Id.* On October 17, 2016, Hornyak followed up with Dr. Chowdhary. R. at 644. Although there was "some thinning of numbness from the back of the right left to the right ankle," Hornyak reported "chronic pain . . . all over [her] body." *Id*. Dr. Chowdhary noted that she had "difficulty walking" and had "swelling in the ankles, more so at the end of the day." *Id.* His physical exam showed tenderness in "18 out of 18" soft tissue trigger points, but "[n]o edema" in her extremities. R. at 646. Dr. Chowdhary opined that her right leg pain may have been caused by her back issues. R. at 647. He referred Hornyak to Dr. John Paggioli ("Dr. Paggioli") for pain management and for consideration for a lumbar epidural injection. *Id.*

Hornyak was seen by Dr. Paggioli on October 25, 2016.  R. at 596–97.  He observed that Hornyak's "hands and fingers were swollen, red, tender, and very hot" and her "feet were tender but not swollen."  R. at 597.  Dr. Paggioli also noted that her gait was normal and that her bilateral motor stretches throughout.  *Id*.  He concluded that Hornyak had "erythromelalgia secondary to sarcoid" and prescribed her lidocaine ointment pain medication.  *Id.*

B.  Procedural History

Hornyak applied for SSDI benefits on December 9, 2015, asserting that she was disabled with sarcoidosis; erythromelalgia; peripheral neuropathy; sensory defect; inflammatory neuropathy; small fiber neuropathy; and fibromyalgia since October 5, 2012.  R. at 92.  The SSA denied Hornyak's claim on February 9, 2016.  R. at 100.  Hornyak sought reconsideration, but the SSA adhered to its original decision.  R. at 125.  Hornyak thereafter requested a hearing, which was held on September 21, 2017, before Administrative Law Judge John Aletta ("the ALJ").  R. at 35.

At the hearing, Hornyak described at length the pain that she experienced.  She testified that her neurological issues "affect both [her] hands, and [her] feet, causing it to be very difficult to walk, very difficult to use [her] hands . . . . The pain is constant."  R. at 48.  First, the ALJ asked Hornyak to describe the problems with her feet.  *Id.*  Hornyak stated that her "feet [] swell uncontrollably, sometimes to the point of the skin splitting.  It makes it impossible to put any pressure on them.  They turn black and blue.  They turn red, white.  They get either burning hot, or freezing cold.  [She] lose[s] feeling in [her] toes."  *Id.*  She expressed that her symptoms began around 2010 and have worsened over time.  R. at 49.  Hornyak also stated that she experiences "flare-ups" in her feet that occur "[p]robably every week."  *Id.*  Each "flare-up" can

last "anywhere from a half-an-hour to two weeks." *Id.*  When Hornyak's feet swell, she has difficulty walking because she stumbles and loses "the feeling in [her] feet." R. at 54.

The ALJ also asked Hornyak to describe the issues she has with her hands. R. at 50.  She testified that her neurological problems cause her hands to shake and make her fingertips go numb. *Id.*  She stated that the redness and swelling in her hands make it impossible for her to type, hold a pen, or deal with paper or money. *Id.*  She also explained that her left hand sometimes tremors uncontrollably. R. at 55.  She expressed that her hand issues are "pretty constant." R. at 65.  Due to her symptoms, Hornyak testified that she stopped working as an office manager on October 2, 2015. R. at 47.  "I couldn't do the typing. I couldn't do the walking.  I couldn't do the detailed concentration work that my job required." *Id.*

Regarding her joint pain, Hornyak testified that she feels pain "all over" her body due to her fibromyalgia and sarcoidosis. R. at 61.  She explained that she had a disc removed in her lower back and that her spine may have weakened from the sarcoidosis. R. at 62.  Hornyak noted that her issues with swelling and numbness in her left leg continued after the surgery. *Id.*  In addition, she testified that he has discs in her neck. R. at 63.  Hornyak also suffers from chronic insomnia. R. at 64.  She explained that she sleeps "[p]robably four to five hours a day." *Id.*  Lastly, Hornyak stated that she takes medication for anxiety, depression, and panic attacks, in addition to Neurontin for pain. R. at 51–52.

The ALJ next heard testimony from Vocational Expert ("VE") Susan Gaudet ("Gaudet").  The ALJ first asked Gaudet to describe and analyze Hornyak's prior work.  Gaudet testified that Hornyak "was an office manager, DOT 219.362-010, with an SVP of four, and a light physical demand level as customarily performed." R. at 69.  The ALJ then asked Gaudet to consider a hypothetical individual who (i) was of the same age, education, and experience as Hornyak; (ii)

could perform work at the light exertional level; (iii) could occasionally climb ramps and stairs; (iv) could never climb ladders, ropes, or scaffolds; (v) could occasionally balance, stoop, knell, crouch, and crawl; (vi) could never work at unprotected heights; (vii) could never work with moving mechanical parts; (viii) must avoid concentrated exposure to dusts, odors, fumes, and other pulmonary irritants; (ix) must avoid concentrated exposure to extreme heat; (x) must avoid concentrated exposure to vibration; and (xi) must avoid concentrated exposure to working in an environment having a noise level greater than moderate noise.  R. at 70.  Then the ALJ asked whether such an individual could either perform Hornyak's past work or work in the national economy.  R. at 71.  Gaudet responded that such an individual could perform past work and could also work as a "linen grader," a "price marker," and a "storage facility rental clerk."  R. at 71–72.

For the second hypothetical, the ALJ asked Gaudet to consider the individual from hypothetical one, but to include the additional limitation of a "sit, stand, walk option," where the hypothetical person had the option "to sit for up to five minutes after every 15 minutes of standing" and "the option to sit for up to five minutes after every 15 minutes of walking."  R. at 75.  Gaudet testified that such an individual would not be capable of performing Hornyak's past work.  *Id*.  Moreover, Gaudet testified that under second hypothetical, the only job that exists in the national economy is the storage facility rental clerk position.  R. at 76.

Next, the ALJ asked whether there were any jobs available if the individual from hypothetical two was limited to sedentary work.  R. at 77–78.  Gaudet initially identified only one sedentary job, a "para mutual ticket checker."  R. at 78.  She later clarified that the storage facility rental clerk position would also be available at the sedentary level.  R. at 82.

The ALJ then asked Gaudet to consider a third hypothetical.  The individual would have all of the limitations of the second hypothetical but could frequently feel and finger with both hands.  R. at 79.  Gaudet initially testified that such a person would be capable of performing Hornyak's past work.  *Id.*  After further discussion with the ALJ, Gaudet clarified that Hornyak's past work could not be performed under those limitations.  R. at 81.  Next, the ALJ asked if the individual from hypothetical three could perform any jobs available in the national economy.  *Id.*  Gaudet initially stated that the only two jobs available would be storage facility rental clerk and laundry folder.  R. at 82.  After following up with the ALJ, Gaudet amended her answer, stating that the "laundry folder" position would be unavailable because "most employers . . . are not going to allow a sit, stand option that [was] offered in hypothetical number two."  R. at 83.  In addition, Gaudet testified that under hypothetical three there would be no jobs in the national economy at the sedentary level.  R. at 84.

The ALJ then offered a fourth hypothetical, incorporating the limitations from hypothetical three, but eliminating the sit, stand option.  R. at 84.  Gaudet testified that the only available job under that hypothetical is an addresser.  *Id.*  The ALJ then asked whether there were any jobs in the national economy that fit within hypothetical three or four that were either semi-skilled or skilled.  R. at 86–87.  Gaudet testified that the job of receptionist would meet those standards.  R. at 87.  When questioned further by the ALJ, Gaudet retracted her answer and stated that semiskilled or skilled jobs were unavailable.  R. at 86–87.

Finally, Gaudet was examined by Hornyak's counsel Kerin Woods ("Attorney Woods").  Attorney Woods followed up regarding the jobs identified under hypothetical one: linen grader, price maker, and storage facility rental clerk.  R. at 88–89.  With respect to those jobs, Attorney Woods asked if there was any employer tolerance for off-task behavior outside of the usual

breaks offered during the morning and afternoon.  R. at 88.  Gaudet testified that employer

tolerance for off-task behavior is 10% of the workday.  *Id*.  Attorney Woods also asked about

employer tolerance for absenteeism.  *Id*.  Gaudet stated that "[a]nything greater than one absence

per month . . . .[w]ould not be tolerated."  *Id*.  Lastly, Gaudet testified that if fingering and

handling with both hands were reduced to occasional, rather than frequent, the jobs of storage

facility retail clerk and addresser would not be available.  R. at 88–89.

### C.  The ALJ's Decision

On October 13, 2017, the ALJ issued an unfavorable decision, concluding that Hornyak

had not been disabled as of December 9, 2015 and denying benefits.  R. at 29.

At the first step of the five-prong inquiry, the ALJ found that Hornyak had not engaged in

substantial gainful activity since October 5, 2012.  R. at 20.

At the second step, the ALJ determined that Hornyak had the following severe

impairments: degenerative disc disease of the lumbar spine (status-post discectomy); idiopathic

neuropathy; fibromyalgia; erythromelalgia; sarcoidosis and left cubital tunnel syndrome.  *Id*.

With respect to those conditions, the ALJ concluded that they "significantly limited [Hornyak's]

physical abilities to perform basic work activities."  *Id*.  The ALJ did not consider Hornyak's

obesity and degenerative disc disease of the cervical spine to be severe impairments.  *Id*.

At the third step, the ALJ held that Hornyak's impairments were not per se disabling

because they were not severe enough to meet the criteria of an impairment listed in 20 C.F.R.

part 404, subpart P, Appendix 1.  *Id*.  In reaching that conclusion, the ALJ acknowledged that

Hornyak underwent spinal surgery in January 2016 to address her degenerative disc disease of

the lumbar spine.  R. at 21.  Nonetheless, the ALJ noted that Hornyak was able to "ambulate

effectively without using an assisting device such as a cane [or] walker."  *Id*.  The ALJ also

stated that Hornyak's "physical examinations have been generally benign and have generally demonstrated her to have a normal gait." *Id.* (internal citations omitted).   Therefore, the ALJ concluded that Hornyak's degenerative disc disease "[was] not listing level." *Id.*

Regarding her erythromelalgia, the ALJ stated that although Hornyak complained of "burning, swelling, and numbness in her feet and hands," the record reflects that her idiopathic erythromelalgia was primarily in her hands. *Id.* Moreover, the ALJ noted that Hornyak's sarcoidosis, according to a report from Dr. Chowhary, "[had] been under control." *Id.* After considering the evidence from Hornyak's medical records, the ALJ adopted Dr. Holmes' opinion that Hornyak's impairments were not at a listing level. *Id.* Accordingly, the ALJ gave "great weight" to Dr. Holmes' option that Hornyak's impairments "[did] not meet, or medically equal, the requirements of any impairments listed." *Id.*

At step four, the ALJ determined Hornyak's residual functional capacity ("RFC") after considering the entire record. *Id.* The ALJ determined that Hornyak could perform light work as defined in 20 CFR §§ 404.1567(b),[3] with the following exceptions: she (1) have the option to sit for up to five minutes after every 15 minutes of standing or walking; (2) can frequently finger and feel with her bilateral hands; (3) can occasionally climb ramps and stairs; (4) can never climb ladders, ropes or scaffolds; (5) could occasionally balance, stoop, kneel, crouch, and crawl; (6) could not work at unprotected heights; (7) could not work with moving mechanical parts; (8) must avoid concentrated exposure to dust, odors, fumes, and other pulmonary irritants; (9) must

---

[3] Light work is defined as: "work [that] involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. § 404.1567(b).

avoid exposure to extreme heat and vibration; and (10) must avoid concentrated exposure to a working environment having a noise level greater than moderate noise.  R. at 21–22.

The ALJ reasoned that, "the overall evidence of record does not generally support [Hornyak's] statements regarding having such severe symptoms and such severe functional limitations . . . [Hornyak's] allegations of severe symptoms and functional limitations are significantly out of proportion with the symptoms, signs and limitations demonstrated in the record."  R. at 23.  To support that conclusion, the ALJ reviewed medical records relating to Hornyak's degenerative disc disease and neuropathy.  The ALJ concluded that although Hornyak testified that she continued to experience pain and numbness in her left foot following her surgery, Dr. Salame's February 12, 2016 notes provide that Hornyak did very well post-surgery and demonstrated "a normal gait and station."  R. at 24.  Moreover, a June 7, 2016 visit with Dr. Salame revealed that Hornyak had "normal range of motion and normal strength in her legs."  *Id.* The ALJ reasoned that those "benign" findings support the conclusion that Hornyak "retains a work capacity despite her impairments."  *Id.*

Regarding Hornyak's sarcoidosis and fibromyalgia, the ALJ cited Hornyak's medical records from an April 13, 2015 visit at New England Rheumatology, where Hornyak complained of a burning pain in her hands along with some redness.  *Id.* at 24.  Despite those complaints, the ALJ highlighted that her "bloodwork [was] normal except for low vitamin D levels, and [Hornyak] had a fairly benign physical examination."  *Id.*  In addition, the ALJ relied on notes from Dr. Gorson's September 4, 2015 visit.  During that consultation, Hornyak complained of numbness in her hands and fingers that limited her ability to hold and grasp objects.  R. at 25.  The ALJ noted, however, that Hornyak "indicated that she could still tolerate crocheting, which demonstrate[d] that she retains a relatively high level of functioning with her hands and fingers."

*Id*. Furthermore, the ALJ noted that after an October 17, 2016 visit, Dr. Chowdhary opined that Hornyak's sarcoidosis was "under control," despite the fact that she "demonstrated 18 out of 18 total tender points." *Id*.

The ALJ also reviewed medical records regarding Hornyak's erythromelalgia. The ALJ acknowledged Hornyak's history of idiopathic erythromelalgia primarily involving her hands, which caused Hornyak to complain of "burning, swelling, and numbness in her feet and hands." *Id*. Hornyak's physical exam on January 8, 2016 revealed "erythematous hands, bilaterally, and mild edematous hands." *Id*. Despite that finding, the ALJ noted that during the visit, Hornyak "had a normal gait and was able to stand without difficulty." *Id*. Moreover, although Hornyak "had some distal sensation loss and could not feel cold temperature in either hand," Dr. Tinklepaugh noted that "her sensation was still present." *Id*.

In reaching the conclusion that Hornyak could perform "light work," the ALJ assigned "little weight" to Mark Mancuso's ("Mancuso") assessment of Hornyak's RFC. *Id*.

> [Mancuso] a single decision maker . . . determined that [Hornyak] retains a[n] [RFC] for a narrow range of light work with postural and environmental limitations . . . . However, I find that [Hornyak's] impairments are more limiting than assessed by [Mancuso]. I note that [Mancuso] is not an acceptable medical source under the Commissioner's regulations, and he never actually observed [Hornyak].

R. at 25–26. (internal citations omitted). In addition, the ALJ assigned "partial weight" to Dr. Holmes' assessment of Hornyak's RFC. R. at 26. "I find that [Hornyak's] impairments are more limiting than assessed by [Dr. Holmes]. I note that Dr. Holmes never actually observed or examined [Hornyak] and did not consider the new evidence received into the record after the reconsideration determination." *Id*.

At the fourth step, the ALJ found that Hornyak was unable to perform any past relevant work. R. *Id*.

16

At the fifth and final step, the ALJ determined—based on Hornyak's RFC, age, education, prior work experience, and Gaudet's testimony that "there are jobs that exist in significant numbers in the national economy that [Hornyak] can perform."  R. at 27. Specifically, the ALJ concluded that Hornyak could perform the job of storage facility rental clerk, which is described in the Dictionary of Occupational Titles ("DOT") as semiskilled light work.  R. at 28.  Gaudet testified that there are approximately 40,000 such positions in the national economy.  *Id.*  ALJ therefore concluded that Hornyak was not disabled from October 5, 2012 through the date of the decision.  *Id.*

## III.    Discussion

On appeal, Hornyak argues that: (1) the ALJ erred by failing to designate her cervical condition and bilateral hand tremor as severe impairments at step two, (2) the ALJ erred in evaluating her subjective symptoms, (3) the ALJ erred in formulating her RFC, and (4) the ALJ erred in relying on Gaudet's testimony.  *See generally*, Mem. in Support of Mot. to Reverse ("Pl's Mem."), Doc. No. 14-1.

The Commissioner counters that (1) the ALJ correctly evaluated Hornyak's impairments at step two, (2) the ALJ properly evaluated Hornyak's subjective allegations, (3) the ALJ's RFC finding is supported by substantial evidence, and (4) the Commissioner met his burden at step five of the sequential evaluation.  *See* Mem. in Supp. Mot. to Affirm ("Def's Mem."), Doc. No. 15.

I address each argument below.

A.   <u>Did the ALH err by failing to classify Hornyak's cervical condition and bilateral hand tremor as severe impairments?</u>

Hornyak first argues that the ALJ erred at step two in finding that Hornyak's

degenerative disc disease of the cervical spine and her bilateral hand tremors were not severe impairments. She contends that the error at step two had "ripple effects" for the rest of the sequential evaluation. Pl's Mem. at 3. In essence, Hornyak argues that by failing to account for her physical limitations related to her cervical condition and hand tremor at step two, the ALJ did not incorporate all of her medical limitations into her RFC when concluding that she could perform light work with frequent fingering and handling. *Id.*

At step two, an impairment is considered severe when it "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). Hornyak contends that there is ample evidence in the record to support a finding that her degenerative disc disease of the cervical spine was a severe condition. She notes that on August 25, 2016, she underwent an MRI that showed "a small left paracentral disc herniation which mildly flattens the ventral aspect of the cervical cord to the left of the midline." R. at 631.

Additionally, Hornyak complained of pain, numbness, tingling, and burning in her arms and hands during medical visits. R. at 514–15, 523, 537. At the hearing, Hornyak testified that her bilateral hand tremors made it difficult for her to lift and carry objects. R. at 54–56. Hornyak contends that, because the ALJ failed to consider those conditions "severe" impairments, Hornyak's RFC finding was erroneous. *See* Pl's Mem. at 7.

In response, the Commissioner argues that the record does not support a finding that either condition was a severe impartment. Regarding Hornyak's cervical condition, the Commissioner contends that the ALJ considered her diagnostic images, which showed that Hornyak had mild degenerative changes of the cervical spine and a small herniated disk. *See* R. at 20 (citing R. at 320, 329, 631). The Commissioner argues that treatment notes from visits

with Dr. Paggioli and Dr. Salame indicated that Hornyak's cervical spine was not tender and that her range of motion was adequate.  Def's Mem. at 4 (citing R. at 538, 553, 628).

With regard to her bilateral hand tremors, the Commissioner asserts that Hornyak's treatment notes did not mention that she had hand tremors.  *Id.* at 5.  "[Hornyak] cites no medical evidence showing that she had hand tremors, and instead cites only her own testimony . . . . Similarly, [her] treatment notes do not indicate that she complained of tremors."  *Id.*

After reviewing the record, I agree with the Commissioner.  There is substantial evidence in the record to support a finding that Hornyak's cervical condition and her hand tremors were not severe.  For example, the August 2016 MRI that Hornyak cites reports that her disc herniation only "mildly" flattened her cervical cord.  R. at 631.  The MRI also reports that she had normal cervical alignment and "no prevertebral soft tissue swelling."  *Id.*  A 2014 report noted that only "[m]ild degenerative changes [were] seen at C4-5, C5-6 and C6-7" along with "[n]o fracture" and "[n]o prevertebral soft tissue swelling."  R. at 320.  During numerous visits, Hornyak denied having neck pain and was observed to have normal range of motion.  *See, e.g.,* R. at 637 ("Denies: headaches, neck pain, neck tenderness"); *see also* R. at 429 ("[n]eck: normal appearance, range of motion.").  Although Hornyak testified at the hearing that her neuropathies "cause[d] [her] hands to shake," her bilateral tremors were not highlighted in her medical records.  R. at 56.  Therefore, I conclude that the ALJ did not err by failing to list Hornyak's cervical condition and hand tremors as severe impairments.

Hornyak also argues that her RFC assessment is erroneous because the ALJ did not consider her symptoms relating to her cervical condition and hand tremors.  The ALJ, however, expressly stated in his decision that "in formulating [Hornyak's] residual functional capacity, [he] considered all of her impairments including her non-severe impairments."  R. at 20.

Moreover, many of Hornyak's symptoms from her cervical condition and hand tremors were also related to her sarcoidosis, neuropathy, and erythromelalgia. Those impairments were considered severe at step two. *Id*.

Because ALJ did not err in failing to list Hornyak's cervical condition and hand tremors as severe impairments, Hornyak's argument fails and remand is not warranted on that ground.

B. <u>Did the ALJ err in the evaluation of Hornyak's subjective symptoms?</u>

Next, Hornyak argues that the ALJ erred in concluding that Hornyak's testimony regarding her symptoms was inconsistent with her medical records. "[Hornyak's] testimony is, in fact, very consistent with the medical records and objective diagnostic testing. [Her] symptoms of significant swelling and redness in the arms, hands, legs and feet have been observed by multiple doctors. Physical examination has confirmed decreased distal sensation in her hands." Pl's Mem. at 9 (internal citations omitted). Hornyak also contends that the ALJ erred by failing to consider her excellent work history in assessing her credibility. "[T]he ALJ failed to even mention, no less discuss, [Hornyak's] strong and consecutive work history prior to her alleged disability onset as part of his credibility assessment." *Id*. at 11.

In response, the Commission asserts that the ALJ applied correct legal standards when assessing Hornyak's testimony regarding her symptoms. "[T]he ALJ carefully contrasted [Hornyak's] testimony with her treatment history, the treatment notes in the record, as well as her activities, and properly found her allegations not entirely consistent with the record as a whole." Def's Mem. at 8 (citing R. 22–25).

Social Security regulations outline a two-step process for evaluating symptoms such as pain. *See Graf v. Berryhill*, 2019 WL 1237105, at *8 (D. Conn. Mar. 18, 2019). First, the ALJ must assess "whether the medical signs or laboratory findings show that a claimant has a

medically determinable impairment that could reasonably be expected to produce the claimant's pain." *Id*. (citing *Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013)) (internal quotation marks omitted). In doing so, the ALJ must evaluate all of the claimant's symptoms and the extent to which the claimant's symptoms "can reasonably be accepted as consistent with the objective medical evidence and other evidence." *See id*. (citing 20 C.F.R. § 416.929(a)). The ALJ "will consider all of [a claimant's] statements about [her] symptoms, such as pain, and any description [her] medical sources or nonmedical sources may provide about how the symptoms affect [her] activities of daily living and [her] ability to work." *Id.* (citing 20 C.F.R. § 416.929(a)). The record must include "objective medical evidence from an acceptable medical source" that indicates that a claimant has a medical impairment that "could reasonably be expected to produce the pain or other symptoms alleged." *Id*. (citing 20 C.F.R. § 416.929(a)).

If the ALJ determines that the first step is satisfied, he or she must then evaluate the "intensity and persistence" of the claimant's symptoms in order to determine the extent to which the claimant's symptoms limit the claimant's ability to work. *See id*. at 7 (internal citations omitted). In undertaking that assessment, the ALJ must consider all of the available evidence, including objective medical evidence, from both medical and nonmedical sources. *Id*. The ALJ, however, may not reject a claimant's subjective opinion regarding the intensity and persistence of the pain "solely because the available objective medical evidence does not substantiate [her] statements." 20 C.F.R. § 416.929(c)(2).

Nonetheless, if the objective medical evidence does not support the claimant's description of her symptoms, the ALJ "must consider the other evidence and make a finding on the credibility of the individual's statements." *Graf*, 2019 WL 123710, at *7 (internal citations omitted). Toward that end, the ALJ should consider the following: (1) the claimant's "daily

activities;" (2) "[t]he location, duration, frequency, and intensity" of the claimant's pain; (3)

"[p]recipitating and aggravating factors;" (4) "[t]he type, dosage, effectiveness, and side effects

of any medication" taken to alleviate pain; (5) "[t]reatment, other than medication" received for

pain relief; (6) measures taken to relieve pain and other symptoms; and (7) "[o]ther factors

concerning [the claimant's] functional limitations and restrictions due to pain or other

symptoms." *Id*. (citing 20 C.F.R. § 416.929(c)(3)).

In deciding the ultimate question of whether the claimant is disabled, the ALJ must

evaluate the claimant's subjective claims of pain "in relation to the objective medical evidence

and other evidence." 20 C.F.R. § 416.929(c)(4). The ALJ must specifically consider "whether

there are any inconsistencies in the evidence and the extent to which there are any conflicts

between [the claimant's] statements and the rest of the evidence, including [the claimant's]

history, laboratory findings, and statements by [the claimant's] medical providers or other

sources concerning how [the] symptoms affect [the claimant]." 20 C.F.R. § 416.929(c)(4). The

symptoms "will be determined to diminish [the claimant's] capacity for basic work activities . . .

to the extent that [the claimant's] alleged functional limitations and restrictions due to symptoms,

such as pain, can reasonably be accepted as consistent with the objective medical evidence and

other evidence." *Id*.

The ALJ's determination "must contain specific reasons for the finding on credibility,

supported by the evidence in the case record, and must be sufficiently specific to make clear to

the individual and to any subsequent reviewers the weight the [ALJ] gave to the individual's

statements and the reasons for that weight." *Cichocki*, 534 F. App'x at 76 (citing Social Security

Ruling 96-7p, 1996 WL 374186, at *2). Although "a single, conclusory statement" that the

claimant is not credible, or a mere recitation of the relevant factors, will not suffice, "remand is

not required where 'the evidence of record permits [the court] to glean the rationale of an ALJ's decision[.]'" *Id.* (citing *Mongeur*, 722 F.2d at 1040).

In his decision, the ALJ acknowledged that Hornyak testified that she "continue[d] to have pain and numbness in [her] left leg and left foot" following her surgery.  R. at 22.  In addition, Hornyak testified that "she has trouble walking, especially when she has numbness and swelling" in her feet and that she "has difficulties [] car[ry]ing objects."  *Id.*  The ALJ also considered Hornyak's testimony detailing how her symptoms impacted her daily activities.  For example, Hornyak testified that she "stopped going grocery shopping one month prior to the hearing due to her pain condition . . . . [She] testified that she could stand for about 5 to 10 minutes before having to alternate positions."  R. at 23.  Despite her testimony, the ALJ concluded that Hornyak's allegations "of severe symptoms and functional limitations [were] significantly out of proportion with the symptoms, signs and limitations demonstrated in the record, [which] undermine[d] the persuasiveness of her statements when she asserts such severe functional limitations."  *Id.*

After reviewing the cited portions of the record, I conclude that the ALJ did not err in his assessment of Hornyak's symptoms.  Hornyak's visits with Dr. Salame following surgery reveal that Hornyak back symptoms were improving.  *See, e.g.,* R. at 541 ("Touch is present over both feet and it is slightly decreased over the anterior foot.  Her station and gait are normal. [Hornyak] is comfortable and appreciative of the relief in her left sciatica.").  Although Hornyak was admitted to the emergency room for back pain on June 7, 2016, a follow-up visit with Dr. Salame on June 17, 2016 showed diminished pain.  *See, e.g.*, R. at 628 ("[Hornyak] seen at the emergency room at [Backus] Hospital and was treated symptomatically . . . . [S]tudies were

reviewed today showing no HNP.  Degenerative changes were noted at L5-S1.  No stenosis.

Indeed since then, her pain has dropped down from 9/10 to 4/10.").

Regarding her erythromelalgia and sarcoidosis, the record supports the ALJ's finding that

although her distal sensation was diminished, Hornyak retained some intact sensation in her

hands.  R. at 25.  For example, during a January 8, 2016 visit with Dr. Tinklepaugh, he noted that

Hornyak's sensation was still present, despite Hornyak's claim that she could not feel with either

hand.  R. at 571.

> It should be noted that with her eyes closed I asked her if she felt pressure while I pressed against the middle of her right index finger and she indicated she did not.  I then moved over to another finger and pressed tightly and she spontaneously said she didn't feel that even though I had not asked her.  This was replicated on the other hand.  Sensation is still present though diminished.

*Id.*  As noted above, Hornyak's sarcoidosis has remained largely under control.  *See, e.g.*, R. at

436 ("[Hornyak] has history of sarcoidosis, but she [has been] doing good.").  The ALJ

concluded that those records support a finding that Hornyak retains a work capacity despite her

impairments. R. at 25.

Hornyak also argues that the ALJ erred "in failing to consider [Hornyak's] excellent

work history in accessing her credibility."  Pl's Mem. at 10.  She cites *Rivera v. Schweiker,* 717

F.2d 719, 725 (2d Cir. 1983), for the proposition that "[a] claimant with a good work record is

entitled to substantial credibility when claiming an inability to work because of a disability."  *Id.*

at 10–11.  In this case, she indicates that the ALJ failed to discuss her strong and consecutive

work history prior to her alleged disability onset as part of his credibility assessment.  *See* Pl's

Mem. at 11.

I find Hornyak's argument unavailing.  First, it is the role of Commissioner, not mine,

"'to resolve evidentiary conflicts and to appraise the credibility of witnesses,' including with

respect to the severity of a claimant's symptoms." *Cichocki*, 534 F. App'x at 75 (internal

citations omitted); *see also Pietrunti v. Dir., Office of Workers' Comp. Programs*, 119 F.3d 1035,

1042 (2d Cir. 1997) ("Credibility findings of an ALJ are entitled to great deference and therefore

can be reversed only if they are 'patently unreasonable.'") (internal citations omitted).

Second, although the ALJ may consider a claimant's strong work history, an ALJ's

decision not to give a claimant's work history controlling weight on the issue of credibility does

not constitute error. *See Legg v. Colvin*, 574 F. App'x 48, 50 (2d Cir. 2014). "[I]t bears

emphasizing that work history is just one of many factors that the ALJ is instructed to consider in

weighing the credibility of claimant testimony." *Id.* (citing *Schaal v. Apfel,* 134 F.3d 496, 502

(2d Cir. 1998)). In this case, although the ALJ did not reference Hornyak's work history in the

decision, he questioned Hornyak extensively about her work record during the hearing. *See* R. at

43–48. In addition, "[a]n ALJ is not required to discuss all the evidence submitted, and [his]

failure to cite specific evidence does not indicate that it was not considered." *See Barringer v.

Comm'n of Social Security*, 358 F. Supp. 2d 67, 79 (N.D.N.Y. 2005) (internal citations omitted).

Therefore, I conclude that remand is not warranted on that ground.

C. Did the ALJ err in formulating Hornyak's RFC?

Next, Hornyak argues that the ALJ erred in his formulation of Hornyak's RFC.

Specifically, the Hornyak contends that the ALJ erred by (1) misconstruing her medical records

and testimony, (2) failing to discuss portions of her medical records. *See* Pl's Mem. at 12–14. In

his decision, the ALJ noted that his RFC finding was based largely on the "benign" findings of

Hornyak's treating physicians. For example, the ALJ's conclusion that Hornyak retains a work

capacity despite her sarcoidosis and fibromyalgia was based on Dr. Chowdhary's "generally

benign findings." R. at 24. "[Hornyak] was seen at New England Rheumatology on April 13, 2015, and . . . had some complaints of burning pain in her hands along with some redness [in] her fingers, but [Hornyak's] bloodwork had been normal except for low vitamin D levels, and [Hornyak] had a fairly benign physical examination." *Id.* In her motion, Hornyak contends that the ALJ ignored the rest of Dr. Chowdhary's findings, which included a physical examination where Hornyak reported "18 out of 18 tender points." Pl's Mem. at 13 (citing R. at 458). Hornyak asserts similar arguments concerning findings from Dr. Gorson and Dr. Tinglepaugh. *See id.* at 13–14.

In addition, Hornyak contends that the ALJ made his formulation on an incomplete record. "The ALJ failed, also, to discuss at all the medical records of [Dr. Paggioli]. [He] examined [Hornyak] on October 25, 2016 and his examination showed [her] to have swollen, red, tender and very hot hands and fingers and foot and leg pain and swelling." Pl's Mem. at 14.

In response, the Commissioner asserts that the ALJ "reviewed the record in detail, including treatment notes from, Dr. Tinklepaugh, Dr. Chowdhary, Dr. Salame, and Dr. Gorson, as well as diagnostic imaging, and [Hornyak's] subjective statements about her symptoms." Def's Mem. at 15 (citing R. 22–26).

After reviewing the ALJ's decision, I conclude that remand is appropriate. Under the applicable guidelines, the SSA is required to "explain the weight it gives to the opinions of a treating physician." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir.1999); *see also* 20 C.F.R. § 404.1527(d)(2) ("[w]e will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Snell*, 177 F.3d at 133.

In his decision, the ALJ failed to specify the weight he assigned to Hornyak's treating physicians. Although the ALJ identifies the weight he assigned to the opinions of Dr. Holmes and Mancuso, he does not provide that information with regard to Dr. Tinklepaugh, Dr. Chowdhary, Dr. Salame, or Dr. Gorson. Failure to do so is legal error. *See Dailey v. Barnhart*, 277 F. Supp. 2d 226, 235 (W.D.N.Y. 2003) ("The ALJ simply does not articulate the reasons for the weight he assigned, if any, to the opinions of Drs. Kline and Lasser. This lapse alone constitutes legal error and requires that the case be remanded.").

The Second Circuit has held that remand is appropriate when it is unclear from the ALJ's decision what legal standard he or she used to determine the weight of a treating physician's opinion.[4]

> [B]ecause we are unsure exactly what legal standard the ALJ applied in weighing Dr. Jobson's opinion, because application of the correct standard does not lead inexorably to a single conclusion, and because the Commissioner failed to provide plaintiff with "good reasons" for the lack of weight attributed to her treating physician's opinion as required by SSA regulations, we conclude that the proper course is to direct that this case be remanded to the SSA to allow the ALJ to reweigh the evidence.

*Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998).

In this case, it is not clear what weight the ALJ assigned Hornyak's treating physicians' opinions when formulating her RFC. I conclude that that error was not harmless because the evidence in the record does not "lead inexorably to a single conclusion." *Id.* The ALJ found that Hornyak could "frequently" finger and feel objects despite her erythromelalgia symptoms. R. at 22. Notes from Hornyak's treating physicians cast doubt on that conclusion. On April 27, 2015,

---

[4] "In determining the amount of weight to give to a medical opinion, the ALJ must consider all of the following: the examining relationship, the treatment relationship, the length of treatment, the nature and extent of treatment, evidence in support of the medical opinion, consistency with the record, specialty in the medical field, and any other relevant factors." *Dorsey v. Saul*, 2020 WL 1307107, at *4 (D. Conn. Mar. 19, 2020) (citing 20 C.F.R. § 416.927(c)(1)-(6)).

Dr. Chowdhary noted that pain from Hornyak's erythromelalgia was "quite severe and [could] last for hours." R. at 413. On September 4, 2015, Dr. Gorson opined that Hornyak "[had] the absolutely classic clinical pattern of episodic swelling, erythema and horrendous pain lasting minutes to hours to days." R. 408. Finally, on January 8, 2016, Dr. Tinklepaugh noted that Hornyak's had "severe loss of quality of life" due to her erythromelalgia. R. at 571. Moreover, the ALJ did not mention Dr. Paggioli's treatment history in the decision.

Because the ALJ failed to specify what weight he assigned to Hornyak's treating physicians' opinions, I conclude that remand is appropriate.

D. <u>Did the ALJ err in Step 5 of the Sequential Evaluation?</u>

Lastly, Hornyak argues that the ALJ erred in relying on Gaudet's testimony in response to questions concerning Hornyak's RFC. "The hypothetical question proposed by the ALJ to [Gaudet] which was based on his RFC finding is not based on an accurate portrayal of [Hornyak's] impairments and therefore, the ALJ committed error both in posing the hypothetical and in relying on [Gaudet's] testimony." Pl's Mem. at 16. In addition, Hornyak also argues that Gaudet's testimony was in conflict with the DOT. *See id.* at 17. "[T]he DOT description of the position of storage facility rental clerk does not allow for sitting at will . . . . [The position] require[s] both standing and walking, and cannot be done from a seated position." *Id.* at 17–18. Finally, Hornyak argues that Gaudet provided inconsistent and contradictory testimony during the hearing. "[A] review of the testimony [] demonstrates that on the date of the hearing [Gaudet] stated that she was ill, and her illness appeared to affect her ability to testify effectively. [Her] [t]estimony . . . was repeatedly contradictory and inconsistent, and she appeared confused by the multiple rapid-fire hypotheticals." *Id.* at 19.

For the reasons stated above, remand is appropriate with regard to the ALJ's assessment of Hornyak's RFC because he failed to assign weight to Hornyak's treating physicians' opinions. As a result, the ALJ necessarily also erred at Step Five of the sequential evaluation, which did not incorporate a complete set of Hornyak's limitations.

**IV. Conclusion**

For the reasons stated, I **deny** the Commissioner's motion to affirm (doc. no. 15) and **grant** Hornyak's motion to reverse (doc. no. 14) to the extent that it asks that I vacate the decision of the Commissioner.  I remand for further development of the record and consideration of the weight to be accorded the various medical opinions provided to the ALJ, consistent with the foregoing reasoning.  The Clerk is further instructed that, if any party subsequently appeals to this court the decision made after remand, that Social Security appeal shall be assigned to me (as the District Judge who issued the ruling that remanded the case).

So ordered.

Dated at Bridgeport, Connecticut, this 20th day of April 2020.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge